# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL A. LEE,** | : | |
| **Petitioner** | : | |
| | : | **No. 1:21-cv-1503** |
| **v.** | : | |
| | : | **(Judge Rambo)** |
| **E. BRADLEY,** | : | |
| **Respondent** | : | |

## MEMORANDUM

On August 31, 2021, *pro se* Petitioner Michael A. Lee ("Petitioner"), who is currently incarcerated at the United States Penitentiary Canaan ("USP Canaan") in Waymart, Pennsylvania, initiated the above-captioned action by filing a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, challenging two (2) incident reports he received while incarcerated at the Federal Correctional Institution in Berlin, New Hampshire ("FCI Berlin").  (Doc. No. 1.)  Petitioner paid the requisite filing fee on September 21, 2021.  (Doc. No. 6.)  In an Order entered September 22, 2021, the Court directed Respondent to show cause why Petitioner should not receive the relief he seeks.  (Doc. No. 7.)  Respondent filed his response on October 12, 2021.  (Doc. No. 9.)  Petitioner filed his traverse on October 29, 2021.  (Doc. No. 10.)  Petitioner's § 2241 petition is, therefore, ripe for disposition.

## I.    BACKGROUND

On March 20, 2022, the United States District Court for the Eastern District of North Carolina sentenced Petitioner to serve 360 months' incarceration for conspiracy to distribute cocaine and a consecutive term of sixty (60) months' for carrying a firearm during a drug trafficking offense.  (Doc. No. 9-1 at 121-22.) Subsequently, the court reduced Petitioner's sentence on the conspiracy conviction to 202 months' incarceration.  (*Id.* at 121.)  Petitioner, therefore, is serving an aggregate sentence of 262 months' incarceration.  His anticipated release date, with good conduct time ("GCT") factored in, is April 5, 2022.  (*Id.* at 120.)

### A.    Facts Regarding Incident Report #3339670

On December 12, 2019, Officer King was conducting irregular rounds in the Special Housing Unit ("SHU") when he observed that Petitioner's cell window was covered in feces, blocking his view into the cell.  (Doc. No. 9-1 at 125.)  Officer King gave Petitioner an order to clear the window, and Petitioner refused.  (*Id.*) Officer King notified operations and issued Incident Report #3339670, charging Petitioner with a violation of Code 208, interfering with a security device.  (*Id.*) Petitioner received a copy of the Incident Report on December 13, 2019.  (*Id.*)  At that time, he was advised of his rights and declined to provide a statement.  (*Id.*)

The Incident Report was forwarded to the Unit Discipline Committee ("UDC") for further action. (*Id.*) Petitioner appeared before the UDC on December 17, 2019, and stated that "covering a window isn't a f***ing 208." (*Id.* at 126.) The UDC advised Petitioner of his rights. (*Id.*) At that time, Petitioner requested that Lieutenant Gutierrez serve as his staff representative and that Dr. Jayne appear as a witness to attest that his window was never covered. (*Id.* at 128.) The UDC referred the Incident Report to a Disciplinary Hearing Officer ("DHO") for further proceedings. (*Id.* at 125.)

Petitioner appeared before the DHO on December 20, 2019. (*Id.* at 131.) The DHO confirmed that Petitioner understood his rights. (*Id.*) Petitioner had initially requested Lieutenant Gutierrez as his staff representative, but he was not available at the time. (*Id.*) Petitioner selected Dr. Chen as his staff representative instead. (*Id.*) Lieutenant Gutierrez provided a written statement, indicating that review of video evidence indicated that Petitioner was not responding to commands and that he was completely covered by the mattress/smock, making it impossible for Dr. Jayne to observe him. (*Id.*) Dr. Chen reviewed the packet of information prepared by Lieutenant Gutierrez and "felt that [Petitioner's] rights had been complied with in this hearing. She indicated that they were ready to proceed." (*Id.*) Dr. Jayne appeared as a witness and stated: "The window was partially covered/smeared in

inmate Lee's feces." (*Id.*)  Petitioner provided a handwritten statement in which he "acknowledged and admitted to being unsanitary by wiping his own feces on the cell window." (*Id.*)

The DHO found Petitioner guilty of Code 330, being unsanitary, after reviewing the Incident Report, Lieutenant Gutierrez's statement, Dr. Jayne's statement, video footage, photographs, and Petitioner's handwritten statement. (*Id.* at 131-33.)  The DHO sanctioned Petitioner with disallowance of fourteen (14) days' GCT and loss of commissary privileges for two (2) months. (*Id.* at 133.)  Petitioner received a copy of the DHO report on January 7, 2020. (*Id.* at 134.)  He subsequently exhausted his administrative remedies with respect to this Incident Report. (*Id.* at 109.)

### B.    Facts Regarding Incident Report #3378349

On March 14, 2020, Petitioner was on suicide watch when Health Services at FCI Berlin notified Officer Tawes that Petitioner was scheduled for a mandatory blood draw due to being on a hunger strike. (*Id.* at 136, 138.)  Officer Tawes went to the health services observation cell and directed Petitioner to submit to hand restraints and allow Nurse Ewalt to draw blood. (*Id.* at 136.)  Petitioner stated, "bring your team, I am not cuffing up without a team, that is policy." (*Id.*)  Officer Tawes again ordered Petitioner to submit to restraints and Petitioner refused. (*Id.*)  Officer

4

Tawes told Petitioner that he would be "seeking authorization to proceed with his blood draw and [Petitioner] stated with his middle finger extended visibly in an insolent manner . . ., 'bring your team.'" (*Id.*) Officer Tawes issued Incident Report #3378349, charging Petitioner with violations of Code 227, refusing to take part in a required physical test or required examination unrelated to testing for drug abuse; Codd 307, refusing to obey a direct order; and Code 312, insolence toward staff. (*Id.*) Petitioner received a copy of the Incident Report on March 15, 2020. (*Id.*) At that time, Petitioner was advised of his rights. (*Id.* at 137.)

The Incident Report was forwarded to the UDC for further action. (*Id.* at 136-37.) Petitioner appeared before the UDC on March 26, 2020, and stated that he was innocent. (*Id.* at 137.) The UDC noted that the UDC hearing had been delayed for more than five (5) days because Petitioner had been on suicide watch until March 20, 2020. (*Id.* at 138.) The UDC advised Petitioner of his rights. (*Id.* at 137, 141-42.) At that time, Petitioner requested that Lieutenant Gutierrez serve as his staff representative and that Officer Araiza appear as a witness. (*Id.* at 142.) The UDC referred the Incident Report to a DHO for further proceedings. (*Id.* at 136.)

Petitioner appeared before the DHO on April 30, 2020. (*Id.* at 145.) The DHO confirmed that Petitioner understood his rights. (*Id.*) Although Petitioner had initially requested Lieutenant Gutierrez as his staff representative, Lieutenant

Gutierrez perceived a conflict of interest, and so Petitioner selected Unit Manager Leblanc as his representative.  (*Id.*)  Officer Araiza was unavailable but provided a written statement.  (*Id.*)  Petitioner provide a statement denying the charges and was notified that the Warden had signed off on the delay in the UDC proceedings.  (*Id.*)

The DHO found the charges of Codes 227, 307, and 312 to be supported by the greater weight of the evidence.  (*Id.* at 146.)  In doing so, the DHO considered the following: the Incident Report; the Advisement of Incident Report Delay; the Responsibility and Competency Evaluation Form; a memorandum from S. Paritsky; notifications from Captain Whittington, Lieutenant Tawes, Lieutenant Slocter, and Acting Clinical Director Pederson; a statement from Officer Araiza; the Hunger Strike Report; clinical encounter reports; an excerpt from Program Statement 5562.05 regarding hunger strikes; an excerpt from a document regarding the medical management of inmates on a hunger strike; Petitioner's complete blood count; and Petitioner's handwritten statement.  (*Id.*)  The DHO sanctioned Petitioner as follows: (1) for Code 307, disallowance of fourteen (14) days' GCT and loss of commissary privileges for two (2) months; (2) for Code 312, disallowance of fourteen (14) days' GCT, forfeiture of fourteen (14) days' non-vested GCT, and loss of commissary privileges for two (2) months; and for Code 227, disallowance of twenty-seven (27) days' GCT, forfeiture of twenty-seven (27) days' non-vested GCT, and loss of email

6

privileges for four (4) months.  (*Id.* at 150.)  Petitioner received a copy of the DHO report on May 7, 2020.  (*Id.*)  He subsequently exhausted his administrative remedies with respect to this Incident Report.  (*Id.* at 114.)

### C.    Summary of Petitioner's § 2241 Petition

Petitioner then filed the instant § 2241 petition.  (Doc. No. 1.)  In his petition, Petitioner argues that his due process rights were violated with respect to Incident Report #3339670 because the DHO found him guilty of a difference offense without providing notice and because Officer King falsified the incident report.  (*Id.* at 6; Doc. No. 4 at 1-3.)  With respect to Incident Report #3378349, Petitioner argues that his due process rights were violated because he has the right to refuse medical treatment pursuant to the Constitution and Bureau of Prisons ("BOP") policy.  (*Id.*)  Petitioner also appears to suggest that when the BOP calculated and applied his GCT losses, they improperly applied such losses to his sentence that was already completed.  (Doc. No. 1-2.)  As relief, Petitioner requests that the Court order the BOP to expunge the Incident Reports and restore his GCT.  (Doc. No. 1 at 7.)

## II.    DISCUSSION

### A.    Due Process Challenges to Incident Reports

Liberty interests protected by the Fifth Amendment may arise either from the Due Process Clause itself or from statutory law.  *Torres v. Fauver*, 292 F.3d 141 (3d

Cir. 2002).  It is well settled that "prison disciplinary proceedings are not part of a criminal prosecution and the full panoply of rights due a defendant in such proceedings does not apply."  *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). Nevertheless, the Supreme Court has held that that there can be a liberty interest at stake in disciplinary proceedings in which an inmate loses good conduct time.  *Id.* at 557.  Because Petitioner's sanctions included the loss of good conduct time, he has identified a liberty interest.

In *Wolff*, the Supreme Court set forth the following minimum procedural due process rights to be afforded to a prisoner accused of misconduct in prison which may result in the loss of good time credit: (1) the right to appear before an impartial decision-making body; (2) twenty-four hour advance written notice of the disciplinary charges; (3) an opportunity to call witnesses and present documentary evidence in his defense when it is consistent with institutional safety and correctional goals; (4) assistance from an inmate representative if the charged inmate is illiterate or complex issues are involved; and (5) a written decision by the fact finder of the evidence relied upon and the rationale behind the disciplinary action.  *Wolff*, 418 U.S. at 563-67.  The Supreme Court has held that the standard of review about the sufficiency of the evidence is whether there is "any evidence in the record that could support the conclusion reached by the disciplinary board."  *Superintendent v. Hill*,

472 U.S. 445, 455-56 (1985); *see also Griffin v. Spratt*, 969 F.2d 16, 19 (3d Cir. 1992). If there is "some evidence" to support the decision of the hearing examiner, the court must reject any evidentiary challenges by the plaintiff. *Hill*, 472 U.S. at 457. The *Hill* standard is minimal and does not require examination of the entire record, an independent analysis of the credibility of the witnesses, or even a weighing of the evidence. *See Thompson v. Owens*, 899 F.2d 500, 501-502 (3d Cir. 1989).

The BOP's inmate disciplinary procedures are codified at 28 C.F.R. § 541, *et seq.*, and entitled *Inmate Discipline and Special Housing Units*. These procedures are intended to meet or exceed the due process requirements prescribed by the Supreme Court. *See Von Kahl v. Brennan*, 855 F. Supp. 1413, 1418 (M.D. Pa. 1994). Pursuant to these regulations, staff shall prepare an Incident Report when there is reasonable belief that a violation of BOP regulations has been committed by an inmate and the staff considers informal resolution of the incident inappropriate or unsuccessful. 28 C.F.R. § 541.5. Under the regulations, an inmate "*ordinarily receives*[s] the incident report within 24 hours of staff becoming aware of . . . involvement in the incident." *Id.* § 541.5(a) (emphasis added). The incident is then referred to the UDC for an initial review pursuant to § 541.7.

The UDC review/hearing is "ordinarily [held] within five work days after [the incident report] is issued" and does not include the initial day staff learns of the incident, weekends or holidays. *Id.* § 541.7(c). If the UDC finds that a prisoner has committed a prohibited act, it may impose any of the available sanctions set forth in 28 C.F.R. § 541.3 (Tables 1 and 2) except loss of good conduct time, disciplinary segregation, or monetary fine. *Id.* If the alleged violation is serious and warrants consideration for more than minor sanctions, or involves a prohibited act listed in the greatest severity category, the UDC must refer the matter to a DHO for a hearing. *Id.*

A DHO "will only conduct a hearing on the incident report if referred by the UDC." 28 C.F.R. § 541.8. An inmate will receive written notice of the charges 24 hours before the DHO hearing unless the inmate waives the notice requirement in which case the DHO can conduct the hearing sooner. *Id.* The inmate is permitted to have a staff representative at the hearing and entitled to make a statement and present documentary evidence. *Id.* After the hearing, the DHO will either: (1) find the inmate committed the prohibited act or similar one described in the incident report; (2) find the inmate did not commit the prohibited act charged; or (3) refer the incident report back for further investigation, review and disposition. *Id.* If an inmate is found to have committed a prohibited act, the DHO can impose any of the

available sanctions listed in Table 1 and 2 of § 541.3.  *Id.*  Finally, the written report or decision of the DHO will contain the following: (1) whether the inmate was advised of his or her rights during the proceedings; (2) the evidence relied on by the DHO; (3) the DHO's finding of guilt or innocence; (4) the sanctions imposed; and (5) the reasons for the sanctions imposed.  *Id.*

### 1.     Petitioner Received His Due Process Rights

The record reflects that Petitioner received his procedural due process rights under *Wolff* and the BOP regulations.  With respect to Incident Report #3339670, Petitioner received a copy of the Incident Report on December 13, 2019, and he appeared before the DHO on December 20, 2019.  (Doc. No. 9-1 at 125, 131.)  Dr. Chen appeared as Petitioner's staff representative, and Dr. Jayne appeared as a witness called by Petitioner.  (*Id.* at 131.)  Moreover, Petitioner received a copy of the DHO's written decision, which included a review of the evidence relied upon and the rationale behind the disciplinary action, on January 7, 2020.  (*Id.* at 134.)

Petitioner alleges that his due process rights were violated because the DHO changed the charged offense from Code 208 to Code 330 without providing Petitioner "an opportunity to properly prepare a defense."  (Doc. No. 4 at 1.) According to Petitioner, the lack of prior notice of the change violated his due process rights.  (*Id.* at 2.)  However, the fact that the Incident Report did not charge

11

Petitioner with a violation of Code 330 is of no consequence. "[P]ursuant to 28 C.F.R. § 541.8(a)(1), a DHO has the authority to find that an inmate 'committed the prohibited act(s) charged, and/or a similar prohibited act(s) as described in the incident report." *Guerrero v. Recktenwald*, 542 F. App'x 161, 164 (3d Cir. 2013). In the instant case, Incident Report #3339670 detailed how Petitioner's cell window had been smeared with feces. (Do. No. 9-1 at 125.) Moreover, Dr. Jayne's testimony, as well as Petitioner's written statement, indicated that Petitioner had wiped his own feces on the cell window. (*Id.* at 131.) The DHO considered these facts and, therefore, "acted within his authority to conclude that [Petitioner] committed a similar, lesser offense than the offense with which he was charged[,] and [Petitioner] received adequate notice of the proceedings against him." *Guerrero*, 542 F. App'x at 164.

With respect to Incident Report #3378349, Petitioner received a copy of the Incident Report on March 15, 2020, and he appeared before the DHO on April 30, 2020. (Doc. No. 9-1 at 136, 145.) Unit Manager Leblanc appeared as his staff representative, and Officer Araiza, Petitioner's witness, provided a written statement because he was unavailable on the date of the hearing. (*Id.* at 145.) Moreover, Petitioner received a copy of the DHO's written decision on May 7, 2020. (*Id.* at 150.) Moreover, while Petitioner's UDC hearing was delayed more than five (5)

days, Petitioner was notified that this was because he had been on suicide watch. (*Id.* at 138.) Petitioner fails to show any prejudice that resulted from this delay. *See Bullard v. Scism*, 449 F. App'x 232, 235 (3d Cir. 2011). Thus, the Court finds that Petitioner received all the procedural due process procedures to which he was entitled.

### 2.   The DHO Decisions Were Based on Sufficient Evidence

### a.   Incident Report #3339670

With respect to the sufficiency of the evidence, Respondent has included the Incident Report and the DHO report, which incorporated the statements provided by Lieutenant Gutierrez, Dr. Jayne, and Petitioner. (Doc. No. 9-1.) These documents unequivocally establish that there was some evidence supporting the DHO's decision.

The DHO stated the following in his decision finding Petitioner guilty of Code 330:

> The DHO finds on December 13, 2019 you were charged with violating prohibited act 208; Interfering with Security Procedures. The DHO noted you were informed that code 208 was being changed to code 330; Being Unsanitary in order to better represent the incident report. The DHO does find sufficient evidence to support the prohibited act 330; Being Unsanitary. Therefore the prohibited act 330; Being Unsanitary[,] is upheld.
>
> To support this finding, the DHO relied upon staff member B. King's written account of the incident paraphrased as follows: On December

13

12, 2019, at approximately 12:45 pm, I Officer B. King was conducting irregular rounds in the special housing unit.  When I came upon cell Z01-101, which is assigned to [Petitioner], I noticed the cell window covered in feces impairing my ability to account for the security, health and wellbeing of the inmate.  [Petitioner] is well aware that he is prohibited from covering any portion of the cell windows or doors as noted in their A&O handbook.  After [Petitioner] disregarded my request of him to clear his window I gave him a direct order which he also refused to follow.  After my direct order was disregarded I immediately notified operations of the situation.  [Petitioner] has ben warned of this behavior in the past, but ha[s] not amended their habit of covering the window to their assigned cell.

The DHO relied upon your handwritten statements: [Petitioner's handwritten statements were scanned and included as part of the DHO's report.  Of note, Petitioner noted that he had used the restroom and had no toilet paper, so had to use his hands and wiped feces on his window while beating on it to get toilet paper.]

The DHO relied upon your staff representative notes (Lieutenant Gutierrez which reads: Nothing was covering the window.  King is observed walking to the grill.  You can see the cell from the grill without walking down the range.  Times are approximate with a 30 minute window, so yes he was there during that approximate time.  No audio.  A review of the video showed Dr. Jayne could see through the window but you were not responding to her voice commands and you were completely covered with the mattress/smock making it so she could not visually see you.

The DHO relied upon your witness statement: Dr. Jayne stated: "The window was partially covered/smeared in [Petitioner's] feces."

The DHO relied upon the evidence photographs which show what appeared to be smeared feces on the cell door window.

Upon conclusion of the sanctions issued, you became insolent and began stating in front of your staff representative to the DHO that this DHO went into the computer and placed you on commissary restriction

14

upon your arrival to FCI Berlin for a UDC hearing you had at FCI
Gilmer.  The DHO informed you that she does not have access to your
UDC files and does not even know what you were referring to and to
get your facts straight prior to accusing the DHO of a falsehood.  You
then stated that a unit team member told you this, but refused to state
who gave you this information.   The DHO informed you that this
hearing was only for the code of 208 that was downgraded to code 300
and if you have issues, you need to go through the administrative
remedy process.

Therefore, based on the greater weight of evidence, that being the
written account of the incident and evidence presented, the DHO finds
you committed prohibited act 330; Being Unsanitary.

(Doc. No. 9-1 at 132-33.)  Moreover, the DHO explained the imposed sanctions,

stating:

The action/behavior on the part of any inmate to be unsanitary or untidy
creates a sanitation and health problem for the institution.  This action
interferes with the institution's ability to provide a safe and orderly
environment for inmates and staff alike.  This type of action/behavior
cannot and will not be tolerated at any time.  The sanctions imposed
were taken to let the inmate know that he, and he alone, will be held
responsible for his actions/behavior.

(*Id.* at 133.)

Petitioner asserts that there is not sufficient evidence to support the charge

because Officer King "lied and falsified official documents."  (Doc. No. 4 at 2.)

Petitioner maintains that Officer King noted that he made rounds in the SHU when

he did not.  (*Id.*)  Moreover, Petitioner states that Officer King never came to his

cell, and that Lieutenant Gutierrez and Dr. Jayne "noted staff could see inside [his]

window." (*Id.*)  Petitioner also avers that he never admitted to being unsanitary, and that staff members never offered him supplies to clean the window.  (*Id.* at 3.)

When an inmate challenges the sufficiency of the evidence supporting the DHO's decision, "the 'some evidence' standard does not require . . . independent assessment of the credibility of witnesses or weighing of the evidence." *Speight v. Minor*, 245 F. App'x 213, 216 (3d Cir. 2007) (quoting *Hill*, 472 U.S. at 455-56).  As an initial matter, while Petitioner did not explicitly state that he had been unsanitary, he admitted in his written statement that he had used his hands to clean himself after using the bathroom and wiped it on the window when he beat on it in an attempt to get more toilet paper.  (Doc. No. 9-1 at 133.)  Moreover, the fact that staff could partially see inside the window does not negate the fact that Petitioner had spread feces on the window.  Moreover, Petitioner's witness Dr. Jayne stated that the window was partially covered with feces.  (*Id.*)  Furthermore, Petitioner's claim that Officer King falsified his report "is not sufficient to establish a due process violation [because he had] the opportunity to rebut the allegedly false accusations and evidence." *See Willis v. Zickefoose*, No. 11-2077 (NLH), 2012 WL 2076827, at *9 (D.N.J. June 8, 2012); *see also Smith v. Mensinger*, 293 F.3d 641, 653-54 (3d Cir. 2002) noting that "so long as certain procedural requirements are satisfied, mere allegations of falsified evidence or misconduct reports, without more, are not enough

16

to state a due process claim").  Thus, contrary to Petitioner's suggestion, "some evidence" supports the DHO's conclusion that he was guilty of violating Code 330. *See Denny v. Schultz*, 708 F.3d 140, 145 (3d Cir. 2013) (noting that a court "need only find that the [Hearing Officer's] decision had 'some basis in fact' in order to affirm the decision as comporting with the Due Process Clause").

### b.    Incident Report #3378349

With respect to the sufficiency of the evidence, Respondent has included the Incident Report, Petitioner's handwritten statement, and the DHO report.  (Doc. No. 9-1.)   These documents unequivocally establish that there was some evidence supporting the DHO's decision.

The DHO stated the following in his decision finding Petitioner guilty of Codes 307, 312, and 227:

> The DHO finds on March 15, 2020, you were charged with violating acts 307; Refusing an Order, 312; Insolence and 227; Refusing to Participate in a Required Physical Test or Examination Unrelated to Testing for Drug Abuse.  The DHO does find sufficient evidence to support the prohibited acts 307; Refusing an Order, 312; Insolence and 227; Refusing to Participate in a Required Physical Test or Examination Unrelated to Testing for Drug Abuse.  Therefore the prohibited acts 307; Refusing an Order, 312; Insolence and 227; Refusing to Participate in a Required Physical Test or Examination Unrelated to Testing for Drug Abuse are upheld.

> The DHO notes that this is your fourth and fifth moderate severity level and your third high severity level incident report in less than twelve months.

To support this finding, the DHO relied upon staff member S. Tawes' written account of the incident paraphrased as follows: On March 14, 2020 at approximately 5:35 pm I was notified by Medical Service Nurse Ewalt that [Petitioner] was to have mandatory blood drawn taken due to his hunger strike status.  At approximately 5:40 pm, I approached the health services observation cell and ordered [Petitioner] to submit to hand restraints and allow Nurse Ewalt to draw blood as ordered. [Petitioner] stated "bring your team, I am not cuffing up without a team, that is policy."  I gave [Petitioner] a second direct order to submit to hand restraints and he stated "I am not cuffing up or giving blood until you bring your team."  Based on [Petitioner']s statement, [Petitioner] refused a direct order and ailed to participate in a required medical procedure as ordered.  I notified [Petitioner], I will be seeking authorization to proceed with his blood draw and he stated with his middle finger extended visibly in an insolent manner toward me "bring your team."

The DHO relied upon staff member S. Paritsky's supporting memorandum paraphrased as follows: On Friday March 13th, 2020 at approximately 2:19 PM a Calculated Use of Force was conducted on [Petitioner] to conduct a Medical Assessment.  [Petitioner] has refused 9 meals up to this point and had refused medical to perform a medical assessment.  Warden Hazlewood was briefed of the situation and authorized a calculated use of force to be assessed by medical. Confrontation Avoidance by Dr. Jayne was successful and [Petitioner] submitted to hand restraints.  [Petitioner] was compliant throughout the medical assessment.  Medical Ewalt attempted to draw blood from [Petitioner] and was unsuccessful.  [Petitioner] remains in the increased observation cell with staff observation.  Medical will reattempt tomorrow on March 14, 2020.

The DHO relied upon staff member C. Whittington's supporting notification paraphrased as follows: [Petitioner's] hunger strike began on March 13, when he refused his ninth meal, and ended on April 2, 2020.

The DHO relied upon staff member S. Tawes' supporting notification paraphrased as follows: At approximately 5:35 on March 14, 2020 the

Operations Lieutenant was notified that [Petitioner] required a medical assessment with a blood draw.  The Activities Lieutenant was notified and attempted to speak to [Petitioner] and advised him he has to be medically assessed.  [Petitioner] stated "go get your team, that is policy, I am not cuffing up until a team is here."  [Petitioner] was given a second direct order to submit to hand restraints and submit to a required physical examination conducted by medical services Nurse Ewalt. [Petitioner] refused again and will receive an incident report for 227 and 307.  Based on the refusal of [Petitioner], Captain Whittington was notified for the request of a 5 man calculated use of force team to obtain a required blood draw and physical examination.  After conferring with Captain Whittington a 4 man team was obtained to maintain positive control of [Petitioner] and if he refused a calculated use of force team would be assembled.   At approximately 6:55 pm [Petitioner] was ordered to submit to hand restraints with the presence of the 4 man positive control team.  [Petitioner] submitted to restraints, was placed in leg irons for staff safety and they maintained positive control for the medical assessment.  Nurse Ewalt conducted a medical assessment, obtained vitals.  [Petitioner] remained complaint while an attempt was conducted to obtain a blood draw but was unsuccessful.

The DHO relied upon staff member P. Pedersen's supporting notifications paraphrased as follows: Replied to the question: "If an inmate is on hunger strike, is it mandatory that blood be drawn?"  Yes, it is the only way we can monitor them.  Initial blood draw and eval are done after missing the 9th meal, and after that according to doctor's orders.

The DHO relied upon staff member M. Slocter's supporting notifications paraphrased as follows: [Petitioner] came to SHU on 3-10-2020 at 1642, he was escorted out of SHU to the suicide watch cell at 1738.  He remained in the suicide cell until 3-19-2020 at 1028.  He was escorted back to SHU  where he currently resides. The "refused meal" tracking began on 3-14-2020 for the breakfast meal and has been tracked ever since.  On 4-2-2020 I received an [email] from B. Malcolm indicating that the hunger strike was considered to be over.  The email was received at 12:50 pm.  As defined in this rule, an inmate is on hunger strike: a. When he or she communicates that fact to staff and is

observed by staff to be refraining from eating for a period of time, ordinarily in excess of 72 hours; or b. When staff observe the inmate to be refraining from eating for a period in excess of 72 hours. When staff consider it prudent to do so, a referral for medical evaluation may be made without waiting 72 hours. [Petitioner] came to SHU on 3-10-2020 at 1642, he was escorted out of SHU to the suicide watch cell at 1738. He remained in the suicide cell until 3-19-2020 at 1028. He was escorted back to SHU where he currently resides. As I understand the policy, [Petitioner] truly did not go on hunger strike until the evening meal on 3-13-2020, which was his 9th meal. The refused meal tracking began on 3-14-2020 for the breakfast meal and has been tracked ever since. [Petitioner] has missed a total of 36 meals as of the evening meal, 3-25-2020.

The DHO relied upon your witness' statement: Officer Araiza stated "I remember [Petitioner] agreeing to cuff up and then refusing the blood draw. The food slot was opened so that hand restraints could be placed on [Petitioner]. I don't remember seeing [Petitioner] give Lieutenant Tawes the middle finger."

The DHO relied upon the Clinical Encounter of [Petitioner] on 3-13-2020 at 14:19 which reads: Chief Complaint: Other Problem. Subjective: Initial Hunger Strike assessment completed in the Health Services increased observation cell after Inmate has refused 9meals. Inmate is currently on suicide. Calculated use of force team used after Inmate stated "I'll cuff up, but I refuse medical treatment. I can refuse, it's in the program statement." Inmate advised that hunger strike assessments are required and cannot be refused. Inmate submitted to hand restraints and was verbally resistant to assessment. Inmate refused to answer questions regarding urine output and fluid intake. Inmate was passive aggressive, refusing to open his mouth for oral mucosa exam. After failed blood draw attempts Inmate states "You want to know how to draw my blood, ask nicely." Inmate was then asked if he would allow his blood draw to be attempted again through the food tray slot a[t] which point he stated "Nope, you ain't playing by the rules" and chuckled. Inmate was passive aggressive throughout exam stating comments like, Good luck finding a job after this, this is assault and battery." Pain: Not applicable. Exam Comments: Weight obtained in

20

a suicide smock.  Inmate's lips were dry, however oral mucosa was not. Blood draw was attempted by this writer in his Right and Left Forearm while in hand restraints, both were unsuccessful.  Inmate's veins are not well pronounced.  Cosigned by Pedersen, MD, Acting Clinical Director.

The DHO relied upon the Clinical Encounter of [Petitioner] which reads on 3-14-2020 at 17:00: Chief Complaint: Other Problem. Subjective: Hunger strike assessment attempted on inmate in increased observation cell.  Inmate is currently on hunger strike and suicide watch.  Inmate submits to hand restraints however, states he refuses to be medically assessed.  Inmate refuses to answer questions.  Inmate actively resistant throughout exam to defeat assessment of vital signs. Pain: Not Applicable.  Exam Comments: Inmate actively resistant while attempting to obtain vitals.  Inmate twists and flexes his arm while this writer attempts to check a blood pressure or radial pulse to the point where evaluating them is unsuccessful.  Inmate also flails his finger in and out to prevent blood glucose from being checked.  Inmate bucks forward and backward while attempting to auscultate the heart. Inmate is unable to be steadied enough to assess vital signs despite two staff attempting to maintain control.  Inmate continues to have a steady gait and strong resistance.  Cosigned by Pedersen, MD, Acting Clinical Director.

The DHO relied upon the Clinical Encounter of [Petitioner] which reads on 3-14-2020 at 17:35: Nursing—Hunger Strike Note encounter at Health Services.  Reason Not Done: Refused.  Comments: Second attempt made to conduct a Hunger Strike Medical assessment.  Inmate was informed by this writer and a Lieutenant that the Clinical Director has ordered a medical assessment and blood draw for labs.  Inmate informed he would be teamed if he refused.  Inmate continued to refuse stating "I refuse, get your team."

The DHO relied upon the Clinical Encounter of [Petitioner] which reads on 3-14-2020 18:55: Chief Complaint: Other Problem. Subjective: Hunger Strike medical assessment reattempted after gather more staff.  Inmate verbally refused medical assessment however submitted to hand restraints.  Inmate more cooperative this assessment,

21

does not actively resist or twist arms and hands while trying to complete assessment.  Inmate continues to refuse to answer questions regarding intake and output.  Pain: Not Applicable.  Exam Comments: Inmate has steady gait.  Skin turgor is taught with no tenting.  Oral mucosa is moist, lips are dry.  Two attempts were made at drawing blood for labs, one to the Left Forearm and one to the Right Forearm, both failed.  No other medical staff on duty to attempt another draw. Inmate was placed in smock, hand and leg restraints.  Hunger Strike Monitoring: 12 missed meals.  Cosigned by Pedersen, MD, Acting Clinical Director.

The DHO relied upon the Responsibility and Competency Evaluation Form which reads: [Petitioner] is responsible for his conduct at the time of the incident and competent to understand the disciplinary proceedings.  Signed and verified by A. Jayne, Staff Psychologist on 3-15-2020.

According to Program Statement 5562.05 Hunger Strikes: When, after a reasonable effort, a health threatening situation exists, the physician may order that treatment be administered without the consent of the inmate.  Simple IVs may be performed in the institution.

According to the Clinical Practice Guidelines for the Medical Management of Inmates on Hunger Strike: Recommendations for the assessment and nutritional augmentation of inmates who are voluntarily in a prolonged fasting or malnourished state.  The hunger striker must be a competent inmate who voluntarily refuses food for a specific purpose.  Baseline evaluation: Severity of clinical characteristics of malnutrition and dehydration.  Measurement of usual body weight (UBW) and body mass index (BMI).  Baseline CBC and comprehensive chemistry panel, including magnesium, phosphate, and thiamine levels.  For Mental Status Changes: Psychiatric Evaluation should be requested.  The description of CBC is Complete Blood Count.

In addition to the previous written account of the incident, the DHO relied upon your statement during the DHO hearing in which you stated, "I never refused to cuff up.  I put all reasons down in my statement.  This program statement says nothing mandatory about that."  The DHO reiterated that you were informed of the Hunger Strike

protocol and were informed that the Clinical Director approved of the mandatory blood draw due to your claim of hunger strike status and due to missing your ninth meal. [Petitioner] replied: "I submitted to a blood draw, he said he got authorization and I submitted and they came back and drew blood." When asked: "So you only submitted when they assembled a use of force team?" [Petitioner] replied: "They didn't use force. Every time I refused and no other shot was written. I never refused they never opened the slot. Lieutenant Tawes never had the key to the slot, so I could never refuse. They violated my due process rights. The statement signed by Dr. Chen not the day I came off suicide watch. Not UDC in five days. They got to see me off suicide watch, the dates are wrong." The DHO informed you that the Warden signed off on the delay.

The DHO relied upon your hand-written statement: [Petitioner's] handwritten statements were scanned and made a part of the DHO Report.]

Your statement: "As Lt. Tawes was either drunk or trying to set me up." You assumed that the lieutenant didn't have the keys is not a valid excuse to refuse your mandatory medical evaluation ordered by the Acting Clinical Director.

This mandatory blood draw was ordered by the Acting Clinical Director. You cannot refuse a blood draw, as it is set in place by the Federal Bureau of Prisons Clinical Practice Guidelines for Medical Management of Inmates on Hunger Strike for the purpose of providing recommendations for the assessment and nutritional augmentations of inmates who are voluntarily in a prolonged fasting or malnourished state.

Therefore, based on the greater weight of evidence, that being the written account of the incident and evidence provided, the DHO finds you committed prohibited acts 307; Refusing an Order, 312; Insolence and 227; Refusing to Participate in a Required Physical Test or Evaluation Unrelated to Testing for Drug Abuse.

(Doc. No. 9-1 at 146-49.)   Moreover, the DHO explained the imposed sanctions,

stating:

> The action/behavior on the part of any inmate to refuse to obey an order given by any staff member interferes with the staff member's ability to complete assignments and to effectively deal with and control the inmates in the assigned work area.

> The action/behavior on the part of any inmate to become insolent towards a staff member poses a serious threat to the ability of the staff member to carry out their assigned duties and effectively deal with other inmates who are placed under their supervision.  This type of action/behavior cannot and will not be tolerated from any inmate.

> Voluntary or intentional decision not to take part in a required physical test or examination unrelated to drug abuse or alcohol testing on the part of any inmate when requested by staff creates an inability of staff to implement the established assessment and nutritional augmentations of inmates by policy.  In the absence of adequate nutritional intake, malnutrition can develop rapidly, sometimes leading to impaired tissue, organ function including increased susceptibility to infection.  This form of rapid-onset malnutrition is usually transient and resolves with early correction of the nutritional deficits.  This is for inmates, as well as staff's wellbeing.  The sanctions imposed by the DHO were taken to let the inmate know that he, and he alone, will be held responsible for his actions/behavior at all times.

(*Id.* at 150.)

In his § 2241 petition, Petitioner asserts that his due process rights were

violated and there is no evidence to support the DHO's findings because he has a

right under the Constitution and BOP policy to refuse medical treatment.  (Doc. No.

1 at 6.)   The Court recognizes that the "Due Process clause of the Fourteenth

24

Amendment substantively protects certain fundamental rights.  Among these are the right to be free from unjustified intrusions into the body, the related right to refuse unwanted medical treatment, and . . . the right to sufficient information to intelligently exercise those rights." *See White v. Napoleon*, 897 F.2d 103, 111 (3d Cir. 1990) (internal citations omitted).  "[C]onvicted prisoners . . . retain a limited right to refuse treatment and a related right to be informed of the proposed treatment and viable alternatives.  The scope of the right to refuse treatment, however, must be circumscribed by legitimate countervailing State interests." *Id.* at 113.  Clearly, the BOP has a legitimate interest in preserving inmates' lives when they are on hunger strikes by mandating medical treatment, including blood draws, to assess their vital signs and to determine whether nutritional augmentation is needed.  *See In re Soliman*, 134 F. Supp. 2d 1238, 1253 (N.D. Ala. 2001) (noting that the government has a legitimate basis for preserving the lives of those in its custody).  Upon review of the record, the Court concludes that "some evidence" supports the DHO's conclusion that Petitioner was guilty of violating Codes 307, 312, and 227.  *See Denny*, 708 F.3d at 145.

### B.    Claim Regarding Sentence Calculation

As noted *supra*, Petitioner also appears to suggest that when the BOP calculated and applied his GCT losses, they improperly applied such losses to his

sentence that was already completed. (Doc. No. 1-2.) Petitioner suggests that the GCT must be disallowed on his consecutive sentence for the firearms charge because it is his only active sentence, thus limiting the amount of GCT available for disallowance. (*Id.*) This argument is identical to one previously raised by Petitioner and rejected by the Court. *See Lee v. Quay*, No. 1:21-cv-952, 2021 WL 4078047, at *3 (M.D. Pa. Sept. 8, 2021). The Court again discerns no error with respect to the BOP's calculation of Petitioner's sentence, and Petitioner is not entitled to habeas relief with respect to this claim.

## III.   CONCLUSION

For the foregoing reasons, the Court concludes that Petitioner was accorded all of his due process rights under *Wolff* and that there was some evidence supporting the decisions made by the DHO. Moreover, the BOP appropriately calculated Petitioner's sentence. Accordingly, Petitioner's § 2241 petition (Doc. No. 1) will be denied. An appropriate Order follows.

26